UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVIS SPECIALTY CONTRACTING, INC.,

       Plaintiff / Counter-Defendant,               Case No. 13-cv-10352
                                                  Hon. Matthew F. Leitman

v.

TURNER CONSTRUCTION COMPANY,

       Defendant / Counter-Plaintiff.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## <u>INTRODUCTION</u>

This civil action arises out of a construction dispute.  In 2010, the Regents of the University of Michigan (the "University") hired Defendant/Counter-Plaintiff Turner Construction Company ("Turner") to serve as the general contractor in connection with the construction of an addition to Crisler Arena, the University's basketball arena.  Turner then entered into a subcontract with Plaintiff/Counter-Defendant Davis Specialty Contracting, Inc. ("Davis") for the installation of an Earth Retention System ("ERS").  The work on the ERS fell behind schedule and was plagued by delays.  The primary issues in dispute are: which party was responsible for the delays and how much in damages, if any, did the non-responsible party suffer as a result of the delays?  Davis alleges that Turner caused the delay and that it (Davis) is entitled to more than $400,000 in damages due to the delay and other breaches of contract by Turner.  Turner alleges that Davis caused the delay and that the delay and other breaches of contract by Davis caused more than $3.0 million in damages.  The Court held a several-day bench trial, and it now issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Before turning to the findings and conclusions, the Court begins with an observation.  At the end of the post-trial oral argument before the Court, one of the attorneys suggested that this is an "easy" case.  The Court respectfully disagrees.

1

While the factual and legal issues are relatively straightforward, it is not "easy" to rule against either of these parties. After hearing at length from each party during the trial, the Court could not help but come away thoroughly impressed with the integrity and character of those involved in this dispute. The principal of Davis, Mr. Ronald Davis ("Mr. Davis"), showed an unwavering commitment to getting the ERS job done. He even came to the job site on his wedding anniversary – a Sunday – because he was so intent on completing the job. And it was equally clear to the Court that Mr. Davis did not just want to finish the job, he wanted to finish the job well – to provide high-quality work. Mr. Davis is exactly the type of high-character subcontractor that any general contractor would want on the job.

The employees of Turner likewise impressed the Court as individuals of high integrity. When the delays in the ERS work began to mount, they worked cooperatively with Davis in an effort to get back on track. They wanted to find a way for Davis to succeed. And during their testimony, they candidly acknowledged that Mr. Davis put in an honest effort to complete the ERS work. They did not cast aspersions nor resort to personal attacks in an effort to prevail in this case.

Under these circumstances, it is anything but "easy" to enter a judgment against one of these parties. But the Court must do so.

For the reasons explained in more detail below, the Court rules that Davis' claim for damages must fail because two express conditions precedent to Davis' right to the payments it seeks were not satisfied.  And the Court rules that Turner is entitled to prevail on its Counterclaim and to an award of the damages it seeks.  The evidence establishes that despite Davis' best and honest efforts, it was responsible for the delay and that the delay caused Turner to suffer the damages it has requested.

## **BACKGROUND**

1.      On April 30, 2010, Turner entered into a master construction contract (the "Master Contract") with the University to build a new Player Development Center for Intercollegiate Basketball (the "Project").  The Project provided for the construction of new offices, exercise and training facilities, locker rooms, and multiple basketball courts.   The Project was immediately adjacent to (and physically connected to) Crisler Arena.

2.      Construction on the Project required excavation of the land next to the eastern wall of Crisler Arena.  That excavation, in turn, required the installation of an ERS.  An ERS ensures that the ground at a worksite remains supported where excavation could undermine an existing structure's stability and integrity.

3.      Turner solicited bids from subcontractors to install the ERS.

3

4.     Davis submitted a bid to perform the ERS work for $820,000.00. Turner accepted Davis' bid, and the two entered into a subcontract (the "Subcontract") on May 5, 2010.  The Subcontract consists of several different documents incorporated by reference, including the Master Contract, a set of "Additional Provisions," and building plans and specifications.  An integration clause provides that these documents establish the complete agreement between Turner and Davis.

5.     The Subcontract established, among other things, the scope of the ERS work that Davis would perform and a construction schedule.  (*See* Subcontract, ECF #1-1, Pg. ID 22-23.)[1]

6.     Under the Subcontract, Davis agreed to perform the following tasks to complete the ERS:

- Installation of 153 concrete augured cast-in-place pilings[2] ("ACIP pilings") and tie-backs along the exterior wall of Crisler Arena (referred to as the "9-Line" component of the ERS);

---

[1] The Court provides selected supporting citations for convenience and as examples of material in the record that support a particular finding.  By giving a specific citation, the Court does not mean to imply that the cited evidence is the sole support in the record for a particular finding.  All of the Court's findings, whether followed by a specific citation or not, are based upon the totality of the evidence presented at the bench trial.

[2] The term "auger cast-in-place" describes the manner in which an ACIP piling is built.  ACIP pilings are installed in rows.  For each piling, the contractor drills into

4

- Installation of 79 concrete pilings and tie-backs in a tunnel (the "Tunnel") that was designed to connect the new Player Development Center and Crisler Arena; and

- Installation of 25 soldier-piling and tie-back-retention structures for walls perpendicular to Crisler Arena on the north and south end of the 9-Line ERS ("Soldier Piles").

---

the earth using a cylindrical auger and pressure injects concrete grout into the hole as the auger is removed, which forms the pilings. After the concrete grout has hardened, the earth is excavated on one side of the pilings and tie-back rods are drilled horizontally through the exposed portions of the pilings into the soil behind them.

5

7.     The Project's construction site appeared as follows:



(Trial Ex. 91E; annotations added)

8.     The Subcontract's construction schedule provided that Davis was to mobilize its equipment on May 24, 2010, and complete all of its ERS work by July 16, 2010.  (*See* Subcontract, ECF #1-1, Pg. ID 22.)  However, the ERS work was delayed from the beginning.

6

9.     The parties blame one another for the delay.  For example, Davis alleges that it could not begin the ERS work on time because Turner did not have the worksite prepared for Davis.  Davis also claims that when it commenced work, it encountered underground obstructions that resulted in further delay. Furthermore, Davis says that Turner exacerbated the delays by mismanaging the Project's workflow.

10.     Turner counters that the site was prepared for Davis to begin the ERS work as originally scheduled and that Davis failed to mobilize its equipment on time.  Furthermore, Turner claims that Davis used inadequate equipment when installing the ERS; that Davis utilized an insufficient number of work crews; that Davis' poor performance and poor-quality work led to delays; and that Davis simply could not keep pace with the Project's construction schedule.

11.     By July 16, 2010 – the intended completion date for the ERS work – ERS work was still ongoing and was far from completed.  The relationship between the parties deteriorated throughout the summer of 2010 and into fall.  On November 19, 2010, Turner declared that Davis was in default under the Subcontract, and Turner terminated the Subcontract.

12.     After Turner terminated the Subcontract, Turner filed an insurance claim under a "Subguard" insurance policy it had purchased from Zurich, North

7

America ("Zurich"). Turner sought indemnification for costs it incurred as a result of Davis' alleged breach of the Subcontract.

13. On January 29, 2013, Davis filed this civil action against Turner. Turner thereafter filed a counterclaim. The Court's findings of fact and conclusions of law with respect to Davis' claim and Turner's counterclaim are set forth below.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DAVIS' CLAIMS

**A.     Davis' Claims**

14. Davis alleges that Turner mismanaged the Subcontract, mismanaged the Project, and wrongfully terminated the Subcontract. Davis seeks $472,350.00 in damages resulting from Turner's alleged breach of the Subcontract, the delays Davis experienced during construction, and for unexpected costs Davis incurred in the course of performing the ERS work. Davis' claim for damages has five discrete components.

15. First, Davis seeks $28,290.00 in damages for additional costs it incurred when installing tie-back bearing plates.[3] The original construction specifications called for Davis to use one-half-inch-thick tie-back plates.

---

[3] Tie-back bearing plates are essentially large square washers to which tie-back rods are bolted.

8

However, the University changed the specifications and ordered Davis to use one-inch-thick tie-back plates.  These plates were more expensive.

16.     Second, Davis seeks $36,660.00 in additional compensation relating to the installation of the ACIP pilings.  Davis says that it is entitled to this additional amount because it installed certain of the ACIP pilings at a greater depth than originally called for under the Project plans and specifications.

17.     Third, Davis seeks $56,400.00 in additional compensation to account for extra time spent drilling obstructed ACIP piling holes.

18.     Fourth, Davis seeks $336,000.00 in delay damages.  Davis alleges that Turner failed to have the worksite ready for Davis to begin construction, failed to account for underground obstructions that Davis experienced when performing ACIP piling and tie-back work, and managed the work schedule so poorly that Davis' ERS work was consistently disrupted.

19.     Fifth (and finally), Davis seeks a $15,000.00 credit for unfinished work after Turner terminated the Subcontract.

**B.      The Relevant Contractual Provisions**

20.     Article V of the Subcontract addresses issues related to delays and associated increased costs and expenses.  As relevant to the dispute before the Court, Article V specifically requires Davis to provide written notice of delays and expressly provides that such written notice is a condition precedent to Davis'

exercise of any rights in connection with such delays.  Article V further expressly

provides that Davis would have no right to payment for delay-related costs and

expenses from Turner unless and until the University paid Turner in full for the

costs and expenses in question.  In pertinent part, that Article provides:

> Should the Subcontractor be delayed, obstructed, hindered or interfered with in the commencement, prosecution or completion of the Work by any cause . . . **the Subcontractor shall not be entitled to any [] extension of time unless the Subcontractor (1) notifies Turner in writing of the cause or causes of such delay, obstruction, hindrance or interference** within forty eight (48) hours of the interference and (2) demonstrates that it could not have anticipated or avoided such delay, obstruction, hindrance or interference and has used all available means to minimize the consequences thereof. **Subcontractor acknowledges that provision of such [written] notice is an essential condition precedent to Subcontractor's rights** in connection with any such delays, obstructive hindrances or interferences to Turner's ability to fully identify, and expeditiously, address and avoid such cause or causes, and accordingly subcontractor expressly waives all rights with respect to any such cause or causes for which notice hereunder was not provided. . . . Subcontractor expressly waives and releases all claims or rights to recover lost profit (except for profit on work actually performed), recovery of overhead (including home office overhead), and any other indirect damages, costs or expenses in anyway [sic] arising out of or related to the Agreement, including the breach thereof by Turner, delays, charges, acceleration, loss of efficiency or productivity disruptions and interferences with the performance of the work.  **It shall be an express condition precedent to any obligation on the part of Turner to make payment of any such cost, reimbursement, compensation or damages of the subcontractor hereunder that Turner shall first be**

> **determined to be entitled to such compensation on behalf of the subcontractor and then receive such payment from owner**, and subcontractor expressly acknowledges that Turner is not obligated or required to pursue subcontractor claims as against owner if Turner, in its sole discretion, after review of subcontractor's claim, is deemed claimed to lack merit in whole or in part.

(Subcontract, ECF #1-1 at 3, Pg. ID 10; emphasis added.)

21.     Article IV of the Subcontract contains what is commonly called a "pay-when-paid" clause.  It provides that Turner's "obligation . . . to make a payment under this Agreement, whether a progress or final payment, or for extras or change orders or delays to the work, is subject to the express condition precedent of payment therefor by Owner."  (Subcontract, ECF #1-1 at 2, Pg. ID 8.)

## C.     Factual Findings

22.     Although Davis and Turner communicated orally regarding construction delays, Davis never gave Turner written notice concerning delays it claimed to be experiencing, nor did Davis ever provide Davis with a written breakdown (with supporting documentation) of the specific increased costs and expenses Davis allegedly incurred as a result of the claimed delays.

23.     Likewise, Davis did not submit to Turner any written notice of any other (i.e., non-delay-related) increased construction costs it claimed to have incurred.  Nor did Davis give Turner any documentation itemizing, explaining, and

justifying the non-delay-related increased costs and expenses underlying its current damages claim.

24.    Without the written notice and supporting documentation described in paragraphs 22 and 23 above, Turner could not fairly evaluate and assess any claim or request by Davis for additional compensation.  Moreover, without such notice and supporting documentation, Turner could not reasonably submit to the University a claim for increased compensation to cover Davis' additional expenses.

25.    Turner did not engage in any conduct that would have led Davis to reasonably believe that Turner (a) did not require written notice of the delay and increased costs associated with the delay; (b) would submit a claim to the University for additional payment on Davis' behalf without written notice and supporting documentation from Davis; and/or (c) would pay Davis additional amounts irrespective of whether Turner had been paid those amounts by the University.

26.    Had Davis submitted to Turner (a) written notice of a claimed delay and a written explanation of the associated increased costs and expenses and/or (b) a written request for additional non-delay-related compensation accompanied by the appropriate and necessary supporting documentation, Turner would have evaluated said submissions reasonably and in good faith and would have sought payment from the University for all additional amounts deemed appropriate.

12

27.     The University has not paid Turner any of the amounts that Davis seeks as damages in this action.  Stated another way, Turner has not been paid for any of the five components of Davis' damages claim.

**D.     Conclusions of Law Regarding Davis' Claims**

28.     Unambiguous contracts are to be enforced as written.  *See Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich. Ct. App. 2010) ("An unambiguous contractual provision reflects the parties' intent as a matter of law, and if the language of the contract is unambiguous, we construe and enforce the contract as written." (quotations and citation omitted)).

29.     Under the plain language of the Subcontract, Davis was required to submit *written* notice of delays and delay-related increased-cost claims to Turner. Absent such written notice, Davis could not exercise any rights associated with the claimed delay, and Davis had no right to any additional compensation as a result of the claimed delay.

30.     Under the plain language of the Subcontract, Davis has no right to any additional compensation (or to any payment under the agreement) unless and until the University first pays Turner.

31.     The written notice requirement identified above in paragraph 20 (from Article V of the Subcontract) and the pay-when-paid provision identified in paragraph 21 above (from Article IV of the Subcontract) are express conditions

precedent – meaning that they encompass "a fact or event that the parties intend must take place before there is a right to performance." *Mikoncyzk v. Detroit Newspapers, Inc.*, 605 N.W.2d 360, 362 (Mich. Ct. App. 1999) (quotations and citation omitted).

32.    The "general rule" is that express conditions precedent "must be literally or exactly fulfilled, or no liability can arise on the promise qualified by the conditions." 13 Williston on Contracts §38:6 (4th ed. May 2015).  Michigan courts have recognized this rule. *See Star of Detroit Line, Inc. v. Comerica*, 1999 WL 33454888, at *3 (Mich. Ct. App. Feb. 16, 1999) ("Our review of several leading legal authorities indicates that generally the standard to be applied to the fulfillment of express conditions is literal fulfillment."); *see also Able Demolition v. Pontiac*, 739 N.W.2d 696, 702 (Mich. Ct. App. 2007) (affirming dismissal of breach of contract claim based upon non-occurrence of a condition precedent).

33.    Davis has no right to any additional compensation related to delays because it failed to satisfy the express condition precedent that it provide written notice to Turner of the delays.

34.    Davis has no right to *any* of the additional compensation it seeks – including compensation for delay-related expenses and for additional non-delay related expenses – because Turner has not received payment of those amounts from the University, and thus the express condition precedent embodied in the pay-

14

when-paid provision of the Subcontract has not been satisfied. *See Berkel & Co. Contractors v. Christman Co.*, 533 N.W.2d 838, 840 (Mich. Ct. App. 1995) (affirming dismissal of breach of contract claim because pay-when-paid condition precedent had not been satisfied).

35.    Davis offers three arguments as to why the failure of the express conditions precedent identified above do not bar its claim for damages, but the Court does not agree with the arguments.  *First*, Davis argues that a condition precedent can be satisfied by substantial performance – as opposed to strict, literal compliance – and Davis says that it substantially complied with the written notice condition by giving Turner repeated oral notice of the delays.  Davis further notes that it is undisputed that Turner was aware that the ERS work was delayed, and thus Davis insists that Turner had all of the knowledge that would have been provided by the absent written notice of the delay.

36.    Davis' argument blurs the distinction between the test for satisfaction of a promisor's obligations under a contract and the test for satisfaction of an express condition precedent.  Under certain circumstances, a promisor may satisfy his contractual obligations – thus entitling him to at least partial performance by the other party – by rendering substantial performance. *See Star of Detroit*, 1999 WL 33454888, at *3.  But substantial performance does not satisfy an express condition precedent.  *Id.*

15

37.     *Second*, Davis argues that Turner frustrated the occurrence of the Subcontract's express conditions precedent (*i.e.*, the written notice provisions) because Turner led Davis to believe that oral notice was sufficient.  But the Court has found as a matter of fact that Turner did not engage in any conduct that could reasonably have led Davis to that conclusion.  Turner did not prevent or frustrate the occurrence of any condition precedent to Davis' right to receive any additional payments.

38.     *Third*, Davis argues that it would have been futile to submit written notice of delay or increased construction costs to Turner.  Davis argues that Turner would not have evaluated such notice and documentation in good faith and that Turner would not have sought additional compensation from the University even if Davis' documentation supported a claim for such compensation.  But the Court has found as a matter of fact that Turner would have reviewed Davis' notice and documentation in good faith and would have sought additional compensation from the University if appropriate.

39.     Accordingly, for the reasons set forth above, the Court concludes that Davis is not entitled to any of the damages that it seeks and that Turner is entitled to judgment in its favor on Davis' claims.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING TURNER'S COUNTERCLAIM

**A.    Turner's Claims**

40.    On March 22, 2013, Turner filed a counterclaim against Davis. Turner alleges that Davis breached the Subcontract by causing construction delays and by performing defective work that did not conform to the Subcontract's requirements.  (*See* Counterclaim, ECF #7 at 5, Pg. ID 57.)  More specifically, Turner claims that Davis, among other things, used outdated and poorly maintained equipment not suited to performing the required ERS work; failed to complete the ERS work according to the Project schedule and caused significant delays; failed to complete the work according to the Project's specifications; failed to correct its defective work; and failed to complete work per the Subcontract.  (*See* Turner Br., ECF #36 at 17, Pg. ID 1317.)

41.    Turner seeks indemnification from Davis under Article XI of the Subcontract, asserting that Davis agreed to "indemnify and hold harmless Turner for reimbursement of all costs incurred in excess of the Subcontract balance to correct the defective Work and complete Davis' scope of work, including legal fees." (*Id.*)

42.    Turner alleges it is entitled to damages in excess of $3.0 million resulting from Davis' delay.

17

## B.    Relevant Contractual Provisions

43.    Article XI of the Subcontract addresses acts by Davis constituting a default under the Subcontract; Turner's right to terminate the Subcontract following notice of a default by Davis; and Turner's rights and remedies against Davis in the event of a default.  In relevant part, Article XI provides as follows:

> Should the Subcontractor at any time, whether before or after final payment, refuse or neglect to supply a sufficiency of skilled workers or materials of the proper quality and quantity, or **fail in any respect to prosecute the Work with promptness and diligence, or cause by any act or omission the stoppage, impede, obstruct, hinder or delay of or interference with or damage to the work of Turner** or of any other contractors or subcontractors on the Project, or fail in the performance of any of the terms and provisions of this Agreement or of the other Contract Documents, or should the Architect determine that the Work or any portion thereof is not being performed in accordance with the Contract Documents . . . . [T]hen in any of such events, **each of which shall constitute a default hereunder on the Subcontractor's part, Turner shall have the right . . . after three (3) days written notice to the Subcontractor mailed or delivered to the last known address of the latter, (a) to perform and furnish through itself or through others any such labor or materials for the Work and to deduct the cost thereof from any monies due or to become due to the Subcontractor under this Agreement, and/or (b) to terminate the employment of the Subcontractor for all or any portion of the Work** . . . and to employ any person or persons to complete the Work and provide all the labor, services, materials, equipment and other items required therefor.  In case of such termination of the employment of the Subcontractor, the Subcontractor shall not be entitled to receive any further payment under this

18

Agreement until the Work shall be wholly completed to the satisfaction of Turner and the Architect and shall have been accepted by them, at which time, if the unpaid balance of the amount to be paid under this Agreement shall exceed the cost and expense incurred by Turner in completing the Work, such excess shall be paid by Turner to the Subcontractor; **but if such cost and expense shall exceed such unpaid balance, then the Subcontractor and its surety, if any, shall pay the difference to Turner.  Such cost and expense shall include, not only the cost of completing the Work to the satisfaction of Turner and the Architect and of performing and furnishing all labor, services, materials, equipment, and other items required therefore, but also all losses, damages, costs and expenses, (including legal fees and disbursements incurred in connection with reprocurement, in defending claims arising from such default and in seeking recovery of all such cost and expense from the Subcontractor and/or its surety), and disbursements sustained, incurred or suffered by reason of or resulting from the Subcontractor's default**. . . . Subcontractor, in addition to any other rights available to Turner hereunder, agrees to indemnify, hold harmless and defend Turner from and against any and all claims, demands, suits, damages, judgments, liabilities, costs and expenses (including legal fees and disbursements) arising out of or related to Subcontractor's breach of any term of the Agreement.

(Subcontract, ECF #1-1 at 5, Pg. ID 29; emphasis added.)

44.     Article III of the Subcontract includes a "time is of the essence" clause, which provides that:

The Subcontractor shall commence the Work when notified to do so by Turner and shall diligently and continuously prosecute and complete the Work with the other work being performed on the Project, in accordance

19

> with those Project schedules as may be issued from time
> to time during the performance of the Work and any
> other scheduling requirements listed in this Agreement,
> so as not to delay, impede, obstruct, hinder or interfere
> with the commencement, progress or completion of the
> whole or any part of the Work or other work on the
> Project.

(*Id.* at 1, Pg. ID 7.)

45.   Article XXI of the Subcontract requires Davis to provide work free

from defects:

> Without limiting the generality of the foregoing, the
> Subcontract warrants to the Owner, the Architect and
> Turner, and each of them, that all materials and
> equipment furnished under this Agreement will be of first
> class quality and new, unless otherwise required or
> permitted by the other Contract Documents, **that the
> work performed pursuant to this Agreement will be
> free from defects and that the Work will strictly
> conform with the requirements of the Contract
> Documents.** Work not conforming to such requirements,
> including substitutions not properly approved and
> authorized, shall be considered defective.

(*Id.* at 8, Pg. ID 32; emphasis added.)

## C.   Factual Findings Concerning Davis' Default

46.   Davis made diligent and good-faith efforts to fulfill its obligations

under the Subcontract.   The principal of Davis, Mr. Davis, was especially

committed to providing high-quality work and to fulfilling Davis' requirements.

The Court was highly impressed with Mr. Davis' commitment and character.

47.    But despite Davis' good intentions and honest efforts, it did not fulfill its contractual obligations to Turner.

48.    More specifically, Davis delayed completion of the ERS work that it contracted to perform.  The Court addresses below the amount of delay attributable to Davis.

49.    Davis' failure to timely complete the ERS work was not caused by any error or omission by Turner in administering the Subcontract, administering the Project worksite, coordinating other subcontractors, or otherwise.

50.    Davis' delay was not its only breach of the Subcontract.  Davis also breached the Subcontract by installing defective and non-conforming tie-backs.

51.    During September and October of 2010, Turner frequently communicated to Davis that Davis was behind schedule; that delays caused by Davis were becoming a serious problem; and that the quality of Davis' ERS work did not meet the Subcontract's specifications and requirements.

52.    On September 1, 2010, Turner issued a formal notice of delay to Davis (the "Notice of Delay").  (*See* Trial Ex. 37.)   Grant Mendeljian ("Mendeljian"), Turner's project manager, notified Davis that the Project still was not moving forward at an acceptable pace and that work had "even slowed since [Turner's prior meeting with Davis] resulting in limited progress being achieved." (*Id.*)  Mendeljian notified Davis that if it "continue[d] to falter in making progress

Turner [would] be required to supplement Davis' workforce in order to complete the work." (*Id.*)

53.     On October 20, 2010, Mendeljian emailed Mr. Davis informing him once again that Davis' defective work was delaying the Project.  (*See* Trial Ex. 40.)

54.     On October 23, 2010, Turner sent a formal letter (the "October 23 Letter") to Davis stating that its ERS work failed "to conform with the requirements of the Subcontract, the Plans, the Specifications and the other Contract Documents."  (Trial Ex. 43.)  Turner also demanded that Davis correct its defective ERS work within 24 hours and informed Davis that noncompliance with the directive would result in Davis defaulting on the Subcontract.  (*See id.*)

55.     On November 5, 2010, Turner sent a written notice of default to Davis (the "Notice of Default").  Turner informed Davis that it received no response to the October 23 Letter, that the construction defects had not been remedied, and that Davis' delays and failure to repair the identified construction defects constituted "a default under the Subcontract."  (Trial Ex. 46.)

56.     On November 19, 2010, Turner sent a letter to Davis terminating the Subcontract (the "Termination Letter") in accordance with Article XI's termination provision.  (*See* Trial Ex. 47.)  Turner asserted that Davis had defaulted on the Subcontract due to Davis' failure to remedy the construction defects identified in

the October 23 letter, its failure to meet construction deadlines, and its failure to conform ERS work to design specifications.  (*See id.*)

57.   Turner did not issue the Notice of Default in bad faith, nor did Turner act in bad faith in terminating the Subcontract.  Turner did not issue the Notice of Default and terminate the Subcontract so as to set up or strengthen its Subguard insurance claim to Zurich.  Turner worked to avoid putting Davis in default and to avoid terminating the Subcontract and only took those steps as a last resort.

58.   Turner performed all of its obligations to Davis under the Subcontract.

**D.   Factual Findings Concerning Delays Resulting from Davis' Default**

59.   Davis and Turner each hired experts to analyze whether the Project delays were attributable to Davis or to some factor beyond Davis' control.  Turner hired Rick Moffat ("Moffat"); Davis hired Jeff Roth ("Roth").  Both Moffat and Roth have backgrounds in construction and have performed other construction-delay analyses.  Moffat and Roth provided competing testimony at trial regarding who was primarily responsible for the Project's delays.  Moffatt opined that Davis was responsible for a substantial portion of the overall delay; Roth disagreed and opined that Turner bore substantial responsibility for the delay.

60.   The Court has reviewed the testimony of both Moffat and Roth. While the Court was impressed with both of these witnesses and found both of

them to be honest and credible, the Court finds Moffat's analysis and testimony to be more persuasive.

61.     In his analysis, Moffat reviewed the Subcontract, all change orders issued during the Project, the Project schedules, inspection reports, Turner's daily construction reports, and the communications between the parties. (*See* April 1, 2015 Trial Tr., ECF #31 at 45, Pg. ID 1057.)

62.     After reviewing all of the relevant materials, Moffat concluded that the Project was delayed for 126 days.  Of those 126 days of delay, Moffat attributed 80 days of non-excusable delay to Davis. (*See id.* at 74, Pg. ID 1086.)

63.     Moffat began by attributing ten days of non-excusable delay to Davis due to its failure to begin installing ACIP pilings on time.  After Davis mobilized its equipment on June 7, 2010, it should have begun installing ACIP pilings on June 14, 2010.  Davis, however, did not actually begin installing the ACIP pilings until June 24, 2010.  Moffat concluded that there were no "specific issues outside of [Davis'] control that impacted its ability to start the piling work" on June 14th. (*See* Trial Ex. 79.)  The Court agrees.

64.     Moffat also attributed 70 days of non-excusable delay to Davis "that can only be explained by the fact that Davis was out there performing the work but performing it much slower than what they had originally planned." (*See* April 1, 2015 Trial Tr., ECF #31 at 49, Pg. ID 1061.)  Moffat concluded that Davis worked

too slowly, with too few workers, and with inadequate equipment. (*See id.* at 65-66, Pg. ID 1077-78; *see also* Trial Ex. 49 at Pg. 16.)   The Court finds that the evidence supports this conclusion.

65.   Davis argues that Moffat's analysis suffers from a "fatal flaw."  Davis says that Moffat made a critical error in his "critical path" analysis.  At trial, Davis questioned Moffat at length on this very point, and the Court was satisfied with Moffat's lengthy explanation and response to Davis' criticism. (*See* April 2, 2015 Trial Tr., ECF #32 at 17-21, Pg. ID 1164-68.)

66.   The Court had several concerns with Roth's analysis, and it therefore declines to adopt his conclusions.   First, Roth opined that Turner's original schedule for the Project was unreasonable, but he too easily discounted the fact that Davis had a full opportunity to review, and object to, the schedule prior to signing the Subcontract.   Second, Roth opined that Turner failed to properly manage the Project site and that Turner allowed the site to become unduly congested. (*See* March 26, 2015 Trial Tr., ECF #28 at 23-24, Pg. ID 556-57.)  The evidence presented at trial did not support either of those assertions.   Third, Roth opined that Davis was entitled to additional compensation for the delays even though Davis did not provide written notice and supporting documentation to Turner before the end of the Project, but Roth was forced to concede that without such notice and documentation Turner could not reasonably and effectively have

25

sought additional delay-related compensation from the University. (*See id.* at 83-84, Pg. ID 616-17.)   Fourth, Roth opined that if and to the extent Davis was required to provide written notice of its claim, Davis provided that notice by filing this civil action.   But it is unreasonable to conclude that filing a lawsuit after the Project's completion satisfies the Subcontract's notice requirements.

67.     In light of Moffat's careful and objective analysis, the Court credits Moffat's testimony on the delay issue over Roth's testimony on that issue and adopts Moffatt's conclusions in their entirety.   Thus, the Court finds that Davis was responsible for 80 days of non-excusable delay.

### E.   Factual Findings Concerning the Costs of Davis' Default to Turner

68.     After Turner terminated the Subcontract, it submitted a Subguard insurance claim to its insurer, Zurich, for costs resulting from Davis' default.   As part of that process, Turner conducted a two-step process to determine the costs increases attributable to Davis.

69.     Mendeljian, along with a project executive at Turner, Robert Bowen ("Bowen"), worked to perform Turner's initial internal review of the costs flowing from Davis' default.   Mendeljian began the process by "tracking any individual piece of cost that was claimed by the subcontractors on site."   (March 31, 2015 Trial Tr., ECF #30 at 60, Pg. ID 930.)   For each subcontractor seeking additional compensation, Mendeljian analyzed whether there was sufficient documentation to

establish that the need for additional compensation was the "result" of Davis' default. (*See id.* at 61, Pg. ID 931.) Bowen also testified that he and several other Turner employees reviewed all of Turner's "canceled checks, canceled checks of the subcontractors, [and] change orders issue[d] to the subcontractors." (*See* April 1, 2015 Trial Tr., ECF #31 at 28, Pg. ID 1040.)

70. Mendeljian explained that Turner "challenged everything" with respect to the claims for additional compensation – that Turner "scrubbed" each one to ensure that it was truly the result of Davis' default. (*See* March 31, 2015 Trial Tr., ECF #30 at 60-61, Pg. ID 930-31.)

71. When Bowen and Mendeljian completed their initial review of the additional costs and expenses attributable to Davis' default, they submitted their work to Turner's outside consultant, Mead Myers ("Myers"). Myers has substantial experience assessing construction-default costs. Myers then performed the second step of Turner's default-cost analysis.

72. Myers conducted a careful and objective review of the cost issue; he did not attempt to manipulate the process to artificially maximize Turner's recovery.

73. Myers audited the documents he received and deleted any overpayments that Turner sought to recover. Myers also communicated with

Bowen if he (Myers) had any questions regarding costs for which Turner sought reimbursement.

74.     Myers created a series of eight loss summaries based on his analysis of Turner's claims.  Myers' loss summaries reflect the costs, expenses, and legal fees Turner incurred as a result of Davis' default.  Myers determined that as a result of Davis' default, Turner incurred $3,294,220.50 in additional construction-related expenses and $286,872.62 in fees and costs.

75.     Turner and Myers submitted Myers' loss summaries to Zurich. Zurich, however, did not immediately review Myers' work.  Instead, Zurich forwarded Myers' work to its own independent consulting company, Proactive, so that Proactive could assess whether Turner's claims for additional compensation based upon Davis' default were sufficiently supported.

76.     Proactive reviewed Myers' work and identified the claims that were sufficiently supported and also identified those claims that lacked support.  For the claims that lacked support, Proactive drafted a "request for information" ("RFI"), requesting that Turner provide additional documentation showing that Turner incurred costs as a result of Davis' default.[4]  Myers was responsible for addressing

---

[4] No representative from Proactive testified at trial.  But Turner's witnesses explained the process completed by Proactive.  By noting Proactive's process, the Court is not adopting Proactive's findings.  Rather, the Court highlights Proactive's work to underscore that Turner's default-damages calculations went through several levels of review.

28

any RFIs issued by Proactive, and upon receipt of an RFI he either provided additional supporting information when available or withdrew the claimed costs if there was not sufficient supporting documentation.

77. Once Proactive completed its review, it submitted its analysis to Zurich's claims handlers for an additional layer of review.

78. Zurich's claims handlers reviewed Proactive's analysis. Zurich thereafter issued payment letters to Turner identifying how much of its claim had been approved, the dollar amount Turner would receive as a result of Davis' default, and provided an RFI to Turner for any portions of the claim that lacked support. (*See id.* April 2, 2015 Trial Tr., ECF #32 at 32, Pg. ID 1179.)

79. Zurich ultimately paid Turner a total of $3,270,157.00 – a full 91% of the claim calculated by Myers and submitted by Turner – to compensate Turner for losses incurred as a result of Davis' default. In addition, there was a retention of $172,114.00 under the Subguard policy.

80. The Court finds Myers' default-damages to be well-supported and persuasive, and the Court adopts the analysis.[5]

---

[5] Davis asserts that Myers and the other parties reviewing Turner's claims improperly attributed certain costs and expenses to Davis. For example, Davis claims that Robert Sanders, a Turner employee, purchased approximately two dozen bagels for work crews on the Project and inappropriately charged that expense to Davis. (*See* March 30, 2015 Trial Tr., ECF #29 at 210-11, Pg. ID 866-67.) Even if Myers erroneously attributed that expense (and other small ones) to

81.     Even without the additional review by Proactive and Zurich, the Court would accept and adopt Myers' default-damages analysis, but that additional review gives the Court added comfort in adopting Myers' calculations and conclusions.[6]

82.     Based on the foregoing, the Court finds that Turner suffered a total loss of $3,581,093.12 as a result of Davis' default.  Specifically, due to that default, Turner suffered $3,294,220.50 in additional construction-related expenses and $286,872.62 in fees and costs.

### E.     Conclusions of Law Regarding Turner's Counterclaim

83.     To establish a claim for breach of contract under Michigan law, Turner must prove (1) the existence of a contract between itself and Davis, (2) the terms of the contract, (3) Davis breached the contract, and (4) the breach caused its injury.  *See Webster v. Edward D. Jones & Co. L.P.,* 197 F.3d 815, 819 (6th Cir.

---

Davis, the cost was so minimal that it does not impact the damages calculations in any appreciable way, nor does it materially undermine Myers' analysis.

[6] The Court recognizes that Turner's right to default-based damages from Davis under the Subcontract and Turner's right to reimbursement for delay costs and expenses under the Subguard policy are not necessarily evaluated under an identical standard.  Thus, the Court does not give conclusive weight to the fact that Zurich determined that Turner is entitled to most, if not all, of the damages it seeks in this action.  But even though the standards may not be identical, the Court nonetheless finds the additional review and approval by Zurich and Proactive to have some relevance here.

1999).  There is no question that there was a valid contract between Turner and Davis.  Thus, the remaining three elements are at issue.

84.     Under the Subcontract's express terms, Davis agreed to prosecute the ERS work with promptness and diligence, to perform work free of defects, and to repair defective work with satisfactory work and materials.  (*See* Subcontract Articles III, X, XI, and XXI, ECF #1-1, Pg. ID 7-8, 29, 32.)

85.     Davis materially breached the Subcontract by failing to prosecute the ERS work with promptness and diligence and by failing to complete the ERS work according to the Project's work schedule.

86.     Davis also materially breached the subcontract by installing defective tie-backs.

87.     Turner's November 5, 2010, Notice of Default was justified in light of Davis' failure to meet the construction schedule's deadlines and repair the defective work it had performed.

88.     Under Article XI of the Subcontract, Turner was permitted to terminate the Contract with Davis on November 8, 2010 – three days after issuing the Notice of Default.  However, Turner waited until November 19, 2010, to terminate the Subcontract.

89.     Turner's termination of the Subcontract was proper pursuant to Article XI.  And, for the reasons explained by Myers and adopted by the Court

31

above, Turner is entitled to $3,581,093.12 in damages as a result of Davis' delays and its defective work.

90.    Davis urges the Court to reject Myers' testimony for two reasons. First, Davis argues that Myers failed to apportion the delay damages between the delays caused by Davis and those caused by Turner.  But Myers testified that he excluded from his damages calculation amounts that were not attributable to Davis. Thus, there was no need for him to conduct any additional apportionment; an apportionment was effectively "baked in" to his methodology from the very beginning.

91.    Second, Davis argues that Myers applied the wrong standard for contractual damages under Michigan law.  Davis says that Myers erroneously applied a "but for" standard of causation without considering whether the damages he assessed were proximately caused by Davis' default.  The Court does not believe that Myers applied the wrong standard.  Myers testified that he considered the test for damages that was expressly spelled out in the Subcontract – that Davis is obligated to pay "all losses, damages, costs and expenses . . . sustained, incurred by reason of or resulting from subcontractor's default" – and that his calculations satisfy that standard.  (April 2, 2015 Trial Tr., ECF #32 at 59-60, Pg. ID 1207.) Moreover, Myers repeatedly explained that he endeavored to determine which additional costs and expenses were fairly "attributable" to Davis, and he testified

that he made that determination by personally investigating the claimed additional costs and expenses to ascertain their connection to Davis' default. (*See id.* at 80-82, Pg. ID 1227-29.)  Finally and most importantly, Myers testified that his damages calculation represents those increased costs and expenses that Turner incurred "*as a result*" of Davis' default.[7]  (*Id.* at 50, Pg. ID 1197; emphasis added.)  That is the standard for causation set forth in the Subcontract.  The Court is satisfied that despite Myers' reference to "but for" causation, he effectively applied the correct causation standard set forth in the Article XI of the Subcontract.

92.     Myers' causation test also satisfies the damages standard set forth in the indemnification language of the Subcontract.  That language requires Davis to indemnify Turner and hold Turner harmless from all damages, costs, and liabilities "arising out of or related to" Davis' breach of any term of the Subcontract.  (*See* Subcontract Article XI, ECF #1-1 at 5, Pg. ID 29.)

93.     The Court awards Turner a total of $3,581,093.12.   This figure reflects $3,294,220.50 in additional construction-related expenses and $286,872.62 in fees and costs.

* * *

---

[7] Bowen testified that he worked with Myers and that, together, they determined the damages that were "directly attributable" to Davis' delay.  (*See* April 1, 2015 Trial Tr., ECF # 31 at 22-23, Pg. ID 1034-35.)   Bowen further explained that during their work together, Myers allowed only those additional costs and expenses that were "directly tieable" to Davis' delay.  (*Id.* at 31, Pg. ID 1043.)

The parties are directed to submit a proposed final judgment reflecting the Court's determinations above.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: February 19, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 19, 2016, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113

34